# 25-1756

## In the United States Court of Appeals for the Second Circuit

---

IN RE: OPENAI, INC. COPYRIGHT INFRINGEMENT LITIGATION

---

On Appeal from the United States District Court for the Southern District of New York, Nos. 1:24-cv-1514, 1:25-md-3143 (Hons. Colleen McMahon & Sidney H. Stein)

---

### BRIEF OF DEFENDANTS-APPELLEES

---

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
  *425 Market Street*
  *San Francisco, CA 94105*

ANDREW M. GASS
LATHAM & WATKINS LLP
  *505 Montgomery Street #2000*
  *San Francisco, CA 94111*

PAVEN MALHOTRA
KEKER, VAN NEST & PETERS LLP
  *633 Battery Street*
  *San Francisco, CA 94111*

LISA S. BLATT
  *Counsel of Record*
THOMAS G. HENTOFF
ERIN M. SIELAFF
ROHIT P. ASIRVATHAM
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellees OpenAI, Inc.; OpenAI GP, LLC; OpenAI, LLC; OpenAI OpCo LLC; OpenAI Global LLC; OAI Corporation, LLC; and OpenAI Holdings, LLC (together, "OpenAI" or "Defendants"), by and through their undersigned counsel, pursuant to Federal Rule of Appellate Procedure 26.1, disclose as follows:

1. OpenAI, Inc. changed its name to OpenAI Foundation on October 28, 2025. OpenAI Foundation states that it has no parent corporation and that no publicly held company has a financial interest in OpenAI Foundation of 10% or more.

2. OpenAI GP, LLC states that it is a subsidiary of OpenAI Group PBC and that no publicly held corporation has a financial interest of 10% or more in OpenAI GP, LLC.

3. OpenAI, LLC states that it is a subsidiary of OpenAI OpCo LLC and that no publicly held corporation has a financial interest of 10% or more in OpenAI, LLC. OpenAI, LLC further states that it is an indirect subsidiary of OpenAI Global, LLC, and that Microsoft Corporation is a publicly held corporation that has a financial interest of 10% or more in OpenAI Global, LLC.

i

4.    OpenAI OpCo, LLC states that it is a subsidiary of OpenAI Global, LLC and that no publicly held corporation has a financial interest of 10% or more in OpenAI OpCo, LLC.  OpenAI OpCo, LLC further states that Microsoft Corporation is a publicly held corporation that has a financial interest of 10% or more in OpenAI Global, LLC.

5.  OpenAI Global, LLC states that it is a subsidiary of OAI Corporation and OpenAI Global HoldCo, Inc. and that Microsoft Corporation is a publicly held corporation that has a financial interest of 10% or more in OpenAI Global, LLC.

6.  OAI Corporation, LLC states that it converted in September 2023 from a limited liability company to a corporation named OAI Corporation.  OAI Corporation is a subsidiary of OpenAI Holdings, LLC and no publicly held corporation has a financial interest in OAI Corporation of 10% or more.

7.  OpenAI Holdings, LLC states that it is a subsidiary of OpenAI Group PBC and that no publicly held corporation has a financial interest in OpenAI Holdings, LLC of 10% or more.

/s/ Lisa S. Blatt
LISA S. BLATT

NOVEMBER 10, 2025

ii

# TABLE OF CONTENTS

Page

Introduction ................................................................................1
Statement of Issues ....................................................................4
Statement of the Case ................................................................5
  A.  Statutory Background ..........................................................5
  B.  Factual Background .............................................................7
  C.  Procedural History ............................................................10
SUMMARY OF ARGUMENT ...................................................15
ARGUMENT ............................................................................20
I.    Plaintiffs Lack Article III Standing ...................................20
  A.  Article III Demands A Concrete Injury ............................20
  B.  Plaintiffs Have Not Alleged A Concrete Injury ..............23
    1.    Plaintiffs' Copyright-Infringement Analogy Fails ...........24
      a.  Copyright Infringement Is An Inapt Analogue ................24
      b.  Harm to Incentives Is Not Itself A Concrete Injury.......33
      c.  Plaintiffs' "Interference With Copyright-Protected Property" Theory Does Not Establish Standing.................38
      d.  Risk of Copyright Infringement Is Not A Concrete Injury ...........41
      e.  Plaintiffs' Alleged Copyright-Infringement Injury Is Not Traceable To The Section 1202 Violation .....................42
      f.  The Constitution's Reference To Copyrights Does Not Establish A Concrete Injury Here ........................43
    2.    Plaintiffs' Unjust-Enrichment Analogy Fails...................44
      a.  Unjust Enrichment Is An Inapt Analogue .......................44
      b.  Plaintiffs' Counterarguments Lack Merit .......................50
II.   There Is No Basis For Jurisdictional Discovery.................54
CONCLUSION...........................................................................56

# TABLE OF AUTHORITIES

Page

## CASES

*Arch Trading Corp. v. Republic of Ecuador,*
   839 F.3d 193 (2d Cir. 2016) ...............................................54, 55

*Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir. 2012) ....................................47, 48

*Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (2024)..............28

*Booker's Adm'r v. Bell's Ex'rs*, 6 Ky. (3 Bibb) 173 (1813)................................45

*Bright v. Boyd*, 4 F. Cas. 134 (C.C.D. Me. 1843)................................................46

*Britton v. Turner*, 6 N.H. 481 (1834)................................................................46

*Cadwallader v. Mason*, 1 Wythe 188 (Va. Ch. 1793) ...................................45, 46

*California v. Texas*, 593 U.S. 659 (2021) ..........................................................42

*Cantor v. Perelman*, 414 F.3d 430 (3d Cir. 2005)............................................53

*City & County of San Francisco v. EPA*, 604 U.S. 334 (2025)........................30

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)........................................37

*del Veccio v. Amazon.com, Inc.,*
   2012 WL 1997697 (W.D. Wash. June 1, 2012) .................................................48

*Effinger v. Hall*, 81 Va. 94 (1885)....................................................................45

*Falkner v. Gen. Motors, LLC*, 393 F. Supp. 3d 927 (C.D. Cal. 2018) ...............5

*Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998) ...............25

*Fischer v. Forrest*, 968 F.3d 216 (2d Cir. 2020) ...............................................6

*Griswold v. Bragg*, 48 F. 519 (D. Conn. 1880) .................................................45

*Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300 (2d Cir. 2024) ..........21, 41, 49

*Hummel v. Hummel*, 14 N.E.2d 923 (Ohio 1938) ..............................................46

*Intercept Media, Inc. v. OpenAI, Inc.,*
   767 F. Supp. 3d 18 (S.D.N.Y. 2025).......................................25, 26, 27, 36, 37

*Kansas v. Nebraska*, 574 U.S. 445 (2015) .......................................................52

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).................................................37

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.,*
   19 F.4th 58 (2d Cir. 2021).....................................................................21, 22

*Mango v. BuzzFeed, Inc.*, 970 F.3d 167 (2d Cir. 2020)....................................5, 6

*Mickles v. Dillaye*, 17 N.Y. 80 (1858) ..............................................................45

*Moreira v. Société Générale, S.A.*, 125 F.4th 371 (2d Cir. 2025)....................53

*Moreno-Godoy v. Kartagener*, 7 F.4th 78 (2d Cir. 2021) ...............................48

*Mount v. PulsePoint, Inc.*, 684 F. App'x 32 (2d Cir. 2017)..............................48

*New York Times Co. v. Microsoft Corp.,*
   777 F. Supp. 3d 283 (S.D.N.Y. 2025)..............................................................15

Page

Cases—continued:

*Northrop's Ex'rs v. Graves*, 19 Conn. 548 (1849) ...............................46
*Olson v. Major League Baseball*, 29 F.4th 59 (2d Cir. 2022).............................46
*Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*,
    105 F.4th 46 (2d Cir. 2024)...............................52
*Pickens' Ex'rs v. Walker's Heirs*, 33 Ky. (3 Dana) 167 (1835).........................45
*Post Univ. v. Course Hero, Inc.*,
    2023 WL 5507845 (D. Conn. Aug. 25, 2023) ...............................5
*Preston v. Brown*, 35 Ohio St. 18 (1878)...............................46
*Rijeski v. Weiland*, 21 Pa. D. 313 (Pa. Ct. Common Pleas 1910) ....................46
*S.F. Bay Area Rapid Transit Dist. v. Spencer*,
    358 F. App'x 793 (9th Cir. 2009) ...............................48
*Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income*
    *Fund*, 88 F.4th 103 (2d Cir. 2023)...............................40
*Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024) ....................22
*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ...............................26
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...............................21
*Thole v. U.S. Bank, N.A.*, 590 U.S. 538 (2020)...............................48, 49
*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ...............................*passim*
*Whitney v. Richardson*, 31 Vt. 300 (1858) ...............................45

## CONSITUTION, STATUTES, AND RULES

U.S. Const.
    art. I, § 8, cl. 3...............................44
    art. I, § 8, cl. 8...............................44
    art. III ...............................*passim*
12 U.S.C. § 2266 ...............................31
15 U.S.C.
    § 78p ...............................52
    § 1114 ...............................28, 33
    § 1115 ...............................28
    § 1117 ...............................28
    § 1125 ...............................28
    § 1681b ...............................31

Page

Constitution, Statutes, and Rules—continued:

17 U.S.C.
    § 102 ..............................................................................38
    § 106 ..............................................................27, 28, 38
    § 106A ............................................................28, 29, 33
    § 202 ..............................................................................38
    § 412 ..............................................................................10
    § 501 ................................................................6, 27, 33
    § 504 ................................................................7, 32, 33
    § 903 ..............................................................................29
    § 1202 ....................................................................*passim*
    § 1203 ....................................................................*passim*
    § 1308 ..........................................................................30
    § 1309 ..........................................................................30
    § 1321 ..........................................................................33
28 U.S.C. § 295 ..................................................................31
35 U.S.C.
    § 154 ..............................................................................28
    § 273 ..............................................................................28
    § 281 ..............................................................................33
Copyright Act of 1790, ch. 15, § 2 ..................................32
Fed. R. Civ. P.
    12 ..........................................................................1, 11, 17
    54 ..................................................................................15
    60 ..................................................................................15

## OTHER AUTHORITIES

J.B. Ames, *Purchase for Value Without Notice*,
    1 Harv. L. Rev. 1 (1887) ............................................45
2 William Blackstone, *Commentaries* ..............................25
*Chapter One: The Intellectual History of Unjust Enrichment*,
    133 Harv. L. Rev. 2077 (2020) ..................................45
H. Rep. No. 105-551 pt. 1 (1998)......................................29
William A. Keener, A Treatise on the Law
    of Quasi-Contracts 16 (1893) ..........................45, 46, 47

Page

Other Authorities—continued:

Bruce A. Lehman, Intellectual Property and the National
Infrastructure, The Report of the Working Group on Intellectual
Property Rights, Information Infrastructure Task Force
(Sept. 1995) ................................................................................5
OpenAI, *How ChatGPT and Our Foundation Models Are Developed*
(June 2025), https://tinyurl.com/sjr3zdmp ....................................8
OpenAI, *How People Are Using ChatGPT* (Sept. 15, 2025),
https://tinyurl.com/3aezrx39 ......................................................7
Restatement (First) of Restitution § 1 (1938) ................................47
Restatement (First) of Trusts § 2 (1935) ......................................53
Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011).........51
Emma Roth, *OpenAI says ChatGPT users send over 2.5 billion
prompts every day*, The Verge (July 21, 2025),
https://tinyurl.com/3777j9ky8.....................................................55
Frederic C. Woodward, The Law of Quasi Contracts (1913) ...........46
Ernest A. Young, *Standing, Equity, and Injury in Fact*,
97 Notre Dame L. Rev. 1885 (2022).......................................46, 47

vii

## INTRODUCTION

Merely separating a news article's title from the article's text does not violate a copyright owner's intellectual-property rights or otherwise inflict a concrete injury.  Yet Article III demands a concrete injury, meaning an actual, real-life injury.  Courts determine whether an injury is concrete by "assess[ing] whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation omitted).  Plaintiffs cannot force their way into federal court armed only with a bare statutory violation.

But plaintiffs here—two news websites—attempt to do just that.  Apparently lacking a cognizable copyright claim, plaintiffs instead allege violations of 17 U.S.C. § 1202, a provision of the Digital Millennium Copyright Act of 1998 (DMCA).[1]  Section 1202(b)(1) prohibits anyone from removing or altering "copyright management information" (CMI), like the author's name or work's title, from a copyrighted work.  And the Act enables "[a]ny person"—not only copyright owners—"injured" by the removal of CMI to sue, allowing

---

[1] OpenAI accepts plaintiffs' allegations as true only for purposes of this appeal of the motion to dismiss under Rule 12(b)(1).

plaintiffs to choose between statutory damages or actual damages. 17 U.S.C. § 1203(a), (c).

Plaintiffs base their section 1202 claim on the development of ChatGPT, a ground-breaking generative AI product. ChatGPT helps hundreds of millions of people worldwide accomplish myriad tasks every day, including proofreading a draft and explaining a difficult concept. ChatGPT is powered by a large language model (LLM) that generates new content in response to prompts from users—a capability garnered by studying billions of examples of text gathered into training sets. OpenAI's researchers trained the LLMs powering ChatGPT to recognize patterns from the language in the training sets. When a user enters a prompt, ChatGPT leverages the patterns gleaned from its training data to predict what words will be responsive to the user's prompt. Plaintiffs allege that in order to train the LLMs, OpenAI amassed billions of writings, including plaintiffs' news articles. According to the complaint, OpenAI downloaded plaintiffs' articles and then removed plaintiffs' CMI in order to create data sets that OpenAI used to train the LLMs powering ChatGPT. Critically, plaintiffs have *never* alleged that this supposed CMI removal itself inflicted any economic or other observable injury.

2

Instead of explaining how the removal of their CMI has concretely harmed them, plaintiffs argue that they have Article III standing because they suffered an injury akin to the injury inflicted by copyright infringement. But copyright infringement inflicts a traditional concrete injury that is missing here. Copyright owners have long been permitted to file copyright-infringement suits upon mere infringement without alleging any additional harm because copyright infringement has long been treated as a property-right infringement. And, as plaintiffs agree, property-right infringements inflict per se injury. Section 1202, however, does not grant a property right at all. And without a property right to CMI integrity, CMI removal does not inflict any property-right injury. The concrete injury inflicted by copyright infringement is therefore lacking here.

In recognition of this gap, plaintiffs offer multiple theories seeking to make CMI removal resemble copyright infringement. But none establishes that the bare removal of CMI inflicts an actual harm akin to the concrete property-right harm inflicted by copyright infringement. That section 1202 prohibits actions that risk actual copyright infringement does not suffice.

Plaintiffs also contend that even if a bare violation of section 1202 does not inflict concrete injury, they have suffered concrete injury because OpenAI

3

allegedly committed copyright infringement in downloading plaintiffs' articles in the process of removing plaintiffs' CMI. But any copyright-infringement injury cannot support standing for this suit because the alleged copying is not traceable to the section 1202 violation at issue here. Plaintiffs' allegation is that OpenAI first copied plaintiffs' articles and *then* removed the CMI. *A fortiori*, any alleged removal of CMI did not *cause* the alleged copying. To the extent plaintiffs claim additional copying after the alleged CMI removal, that copying is not traceable to the alleged CMI removal, either.

After plaintiffs' copyright analogy failed to convince the district court below, plaintiffs attempted a second analogue along with their proposed amended complaint: unjust enrichment. But, as the district court correctly held, plaintiffs also have not suffered any injury that has historically justified unjust-enrichment suits. Unjust-enrichment claims require the defendant's enrichment to come at the plaintiff's expense. Plaintiffs have alleged no such loss.

This Court should affirm the dismissal of plaintiffs' DMCA claim.

## STATEMENT OF ISSUES

1.    Whether plaintiffs have Article III standing.

2.     Whether the district court abused its discretion in denying plaintiffs jurisdictional discovery into the alleged dissemination of their articles by ChatGPT.

## STATEMENT OF THE CASE

### A.     Statutory Background

Enacted as part of the DMCA, the statutory provision at issue here regulates CMI, which is certain "information conveyed in connection with copies" of a copyrighted work.  17 U.S.C. § 1202(b)(1), (c).  CMI acts as a "license plate for a work on the information superhighway," and includes information like the work's title, author, copyright owner, terms and conditions for use, and identifying numbers or symbols.  Bruce A. Lehman, Intellectual Property and the National Infrastructure, The Report of the Working Group on Intellectual Property Rights, Information Infrastructure Task Force 235 (Sept. 1995); 17 U.S.C. § 1202(c)(1)-(7).  A photographer's photo credit on a photograph, an artist's signature on a painting, and a company's watermark on a document all can constitute CMI.  *E.g.*, *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 172 (2d Cir. 2020) (photo credit); *Falkner v. Gen. Motors, LLC*, 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018) (artist's signature); *Post Univ. v. Course Hero, Inc.*, 2023 WL 5507845, at *5 (D. Conn. Aug. 25, 2023) (watermark).

5

Section 1202 prohibits taking specific actions with respect to CMI. Specifically, the Act forbids anyone from (1) "intentionally remov[ing] or alter[ing] any" CMI; (2) distributing or importing CMI knowing that it has been removed or altered; and (3) distributing works or copies of works "knowing that [CMI] has been removed or altered," if certain other conditions are met. 17 U.S.C. § 1202(b)(1)-(3). The DMCA aims to "prevent[] fraud and misinformation," *Fischer v. Forrest*, 968 F.3d 216, 222 (2d Cir. 2020) (citation omitted), and imposes a strict double-scienter requirement, *Mango*, 970 F.3d at 172. So the removal or alteration of CMI must be done (1) intentionally and (2) knowing it will "induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b); *e.g.*, *Mango*, 970 F.3d at 172.

The Act empowers "[a]ny person injured by a violation of section … 1202 [to] bring a civil action in an appropriate United States district court for such violation." 17 U.S.C. § 1203(a). The fact that "any person injured" can sue under the DMCA distinguishes a CMI-removal claim from a copyright-infringement claim, which may only be brought by the "owner of an exclusive right under a copyright." *Id.* § 501(b).

A DMCA civil action also comes with the potential for steep statutory penalties, ranging from $2,500 to $25,000 per violation. *Id.* § 1203(c)(3)(B). In

6

certain cases, the DMCA's statutory penalties might far outpace the $30,000-per-work statutory damages available for traditional copyright-infringement claims. *Id.* § 504(c)(1). Alternatively, plaintiffs may seek their "actual damages and any additional profits of the violator." *Id.* § 1203(c)(1)(B). But in either case, damages are available only to those "person[s] injured by" a DMCA violation. *Id.* § 1203(a).

### B. Factual Background

1. ChatGPT is a revolutionary generative AI product with 700 million active weekly users. OpenAI, *How People Are Using ChatGPT* (Sept. 15, 2025), https://tinyurl.com/3aezrx39. To use ChatGPT, a user enters a prompt, and the system processes that prompt to generate and return new content to the user. *See* JA107, JA114. ChatGPT can help users with countless everyday tasks, from brainstorming ideas and simplifying complex concepts to providing recommendations and learning languages. *See* OpenAI, *How People Are Using ChatGPT*.

To develop ChatGPT's generative capability, OpenAI's researchers trained each version of the LLMs powering ChatGPT using training sets. JA75, JA107. The training sets contain "massive amounts" of text—indeed, "potentially billions of input examples"—which the LLMs studied to learn how

7

"humans write and speak." JA103, JA107. Specifically, OpenAI's researchers train the LLMs to recognize patterns in the datasets, and ChatGPT is trained to use those patterns to predict what words will be generated as responsive to a user's prompt. JA107; OpenAI, *How ChatGPT and Our Foundation Models Are Developed* (June 2025), https://tinyurl.com/sjr3zdmp.

2. Plaintiffs—Raw Story Media, Inc. and AlterNet Media, Inc.—are news websites that publish online content including news stories and opinion pieces. JA104-05. Plaintiffs' online publications are available for the public to read, and plaintiffs allege that their publications are copyrighted, though they never sought to register their works. *See* JA106; Appellants Br. 8 n.6.

Plaintiffs claim that OpenAI included "thousands" of their copyrighted works of journalism in ChatGPT's training sets without the author, title, and copyright notice. JA118. Plaintiffs assert that OpenAI violated the Act in removing CMI when creating the training sets. JA121. They claim that OpenAI did so "because doing so involves fewer computational resources" than including CMI in the training sets. JA121.

Plaintiffs allege that OpenAI trained earlier versions of the LLMs underlying ChatGPT with three data sets: WebText, WebText2, and Common Crawl. JA107.

***WebText & WebText2***.  Plaintiffs say that OpenAI created the WebText training set using two software programs, Dragnet and Newspaper, "to extract text from websites."  JA109.  For both programs, plaintiffs contend that OpenAI first "download[s] and save[s] the relevant webpage before extracting data from it."  JA110.  Plaintiffs claim that Dragnet then "separate[s] the main article content from other parts of the website, including footnotes and copyright notices."  JA109 (citation omitted).  As to Newspaper, plaintiffs assert that OpenAI had "the choice to extract or not extract author title and information," but "chose not to extract [that] information because [it] desired consistency with the Dragnet extractions."  JA109.  All told, plaintiffs allege that, in preparing the WebText dataset, OpenAI removed the author, title, and copyright notice information from plaintiffs' articles.  JA109-11.  Plaintiffs claim WebText2 is "an expanded version of WebText" that programmers created using the same methods.  JA108.

***Common Crawl***.  As to Common Crawl, plaintiffs allege it is "a data set that consists of a scrape of most of the internet created by a non-profit research institute."  JA112.  According to plaintiffs, to train an earlier version of the LLMs underlying ChatGPT, "OpenAI downloaded Common Crawl data from the third party's website and filtered it to include only certain works."

9

JA112.  Based on information Google provided about how it trained its AI models, plaintiffs say that OpenAI used Common Crawl similarly and removed CMI from articles in the data set.  JA112-13.

3.  Plaintiffs claim that "[a]t least some of the time" ChatGPT's outputs "mimic" copyrighted works.  JA114-15.  But plaintiffs do not identify any of their own news articles that ChatGPT has allegedly "abridged" in response to user prompts and instead point to examples from other news agencies in other lawsuits.  JA114-17.  And despite these allusions to copyright infringement, plaintiffs do not (and cannot) raise a copyright-infringement claim because they never registered their works, Appellants Br. 8 n.6., and registration is a prerequisite to statutory damages and attorney's fees under the Copyright Act, 17 U.S.C. § 412.

## C. Procedural History

1.  ***Complaint***.  In February 2024, Raw Story and AlterNet sued seven OpenAI entities (collectively, "OpenAI"), raising a single claim under the DMCA premised on the alleged removal of CMI from their articles to create ChatGPT's training sets.  JA77, JA82-84; 17 U.S.C. § 1202(b)(1).  Plaintiffs sought (1) statutory damages or actual damages, (2) an injunction requiring OpenAI to "remov[e] all copies of Plaintiffs' copyrighted works … from their

training sets and any other repositories," and (3) attorney's fees and costs. JA84. Notably, the complaint included no copyright-infringement claim.

2. ***Motion to Dismiss***. In April 2024, OpenAI moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). JA86-89. On subject-matter jurisdiction, OpenAI argued that plaintiffs lacked standing for two reasons. First, OpenAI contended that plaintiffs' claimed injury—the alleged removal of CMI from plaintiffs' articles when constructing the training sets—was not concrete. D. Ct. Dkt. 68 at 5-6. Under *TransUnion*, a statutory injury must have a historical or common-law analogue to satisfy Article III, and OpenAI argued that an injury premised on the mere removal of CMI lacked any such predecessor. *Id.* Second, OpenAI contended that plaintiffs lacked a particularized injury, because the complaint never alleged that plaintiffs' own articles had been or were likely to be generated by ChatGPT. *Id.* at 8-9.

On the merits, OpenAI advanced other bases for dismissal, including that plaintiffs could not sue using the DMCA's cause of action because they were not "person[s] injured" under section 1203(a), plaintiffs failed to specify the alleged copyrighted works at issue, and plaintiffs failed to adequately plead scienter. *Id.* at 9-17.

11

The district court granted the motion to dismiss on standing grounds and did not reach any other issue. JA94. Starting with plaintiffs' claim for actual or statutory damages, the court concluded plaintiffs' alleged injury was not concrete. Plaintiffs requested actual or statutory damages based on "the unauthorized removal of CMI from their copyrighted works" despite failing to allege "that a copy of their work from which the CMI has been removed has been disseminated by ChatGPT to anyone in response to any specific query." JA95. That alleged injury lacked a historical or common-law analogue. The court reasoned that copyright infringement and interference with property were inapposite because the DMCA protects the integrity of a work's CMI—not the work itself. JA95. Indeed, the court explained that defendants can create infinite unauthorized copies of a work without transgressing the DMCA so long as they include CMI. JA95. The court concluded that "the mere removal of identifying information from a copyrighted work—absent dissemination"—lacks a "historical or common-law analogue." JA96.

Plaintiffs also lacked standing to seek their requested injunction because the asserted harm was hypothetical and speculative. Plaintiffs failed to "plausibly allege[] that there is a 'substantial risk' that the *current* version of ChatGPT will generate a response plagiarizing one of *Plaintiffs'* articles."

12

JA98.  Rather, the complaint alleged that OpenAI trained its models on "massive amounts of information from innumerable sources on almost any given subject."  JA98.  Given "the quantity of information" in the repository, "the likelihood that ChatGPT would output plagiarized content from one of Plaintiffs' articles seems remote," foreclosing injunctive relief.  JA98.

3.  ***Proposed Amended Complaint***.  Plaintiffs thereafter moved for leave to amend or, alternatively, jurisdictional discovery.  JA100.  The proposed amended complaint added new allegations about the construction of ChatGPT's training sets and about ChatGPT's responses to user prompts.  *Supra* pp. 8-10.  Plaintiffs also attached several exhibits, including a list of their copyrighted articles and a list of articles that apparently appeared in two reconstructions of the training sets that plaintiffs themselves created.  JA126-54; D. Ct. Dkt. 119-2-119-20.

Plaintiffs again brought a sole claim under the DMCA premised on the alleged removal of CMI from their articles when creating the training sets.  JA123-24; 17 U.S.C. § 1202(b)(1).  This time, plaintiffs sought (1) statutory or actual damages, (2) an injunction "requiring Defendants to remove all copies of Plaintiffs' copyrighted works from which [CMI] was removed from their training sets and any repositories," (3) an injunction "prohibiting the unlawful

13

conduct alleged," (4) "an injunction ordering the destruction of all GPT or other LLMs and training sets that incorporate Plaintiffs' works without" CMI, and (5) attorney's fees and costs. JA125.

4. ***Denial of Leave to Amend***. The district court denied plaintiffs' motion for leave to amend. JA184. The court held that the claim for damages still failed. Plaintiffs' proposed amended complaint alleged "the *same* injury" as the original complaint—"the unauthorized removal of CMI," without any actual dissemination. JA184. And that injury lacked historical foundation, notwithstanding plaintiffs' new appeal to unjust enrichment. Plaintiffs never explained how reducing the costs associated with training the LLMs by removing CMI would have affected plaintiffs. JA185.

The claim for injunctive relief also failed. The proposed amended complaint did not add new allegations related to plaintiffs' works and thus did not show a "certainly impending injury or substantial risk" that ChatGPT would disseminate plaintiffs' articles without CMI. JA185-86 (citation omitted).

The court lastly found jurisdictional discovery unwarranted because "Plaintiffs are looking for a needle in a haystack." JA186. The court reasoned it was unlikely that discovery would "produce the facts needed to withstand a Rule 12(b)(1) motion." JA186 (citation omitted).

14

5. ***Transfer***.  Later that same day, the U.S. Judicial Panel on Multidistrict Litigation transferred plaintiffs' lawsuit to Judge Stein for inclusion in the multidistrict litigation concerning copyright-related claims brought by various plaintiffs against OpenAI.  JA187-90.

6. ***Motion for Reconsideration***.  Plaintiffs moved for reconsideration of the dismissal of their complaint without leave to amend under Rule 54(b), JA192, contending that the district court's motion-to-dismiss opinion conflicted with Judge Stein's subsequent decision in *New York Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 311-12 (S.D.N.Y. 2025).  There, Judge Stein had held that copyright infringement provided the requisite historical or common-law analogue under *TransUnion* for an injury under the DMCA.  *Id.* Judge Stein denied the motion.  JA197-99.  Treating the request as a Rule 60(b)(6) motion, Judge Stein held that "extraordinary circumstances" justifying relief were lacking because plaintiffs could simply file a direct appeal. JA194, JA197-99.  This appeal followed.  JA200.

## SUMMARY OF ARGUMENT

The district court correctly held that plaintiffs lack standing.  Plaintiffs cannot sue simply because a statutory right has been violated.  Statutory violations do not themselves inflict concrete injury.  Plaintiffs must instead show

15

that the statutory violation caused a real-world injury. Precedent and history support the common-sense conclusion that separating an article's title, copyright notice, or author's name from the text of the article does not itself inflict a concrete injury. That such conduct might violate section 1202 in some circumstances does not change the calculus. While plaintiffs can sue when a section 1202 violation causes a concrete injury, plaintiffs here have failed to allege that the alleged violation has caused them any harm for Article III purposes.

I.A. Plaintiffs claim that removing CMI inflicts the same sort of injury as copyright infringement. But copyright infringement has long been considered a concrete injury, even absent any proof of harm beyond the infringement itself, because copyright infringement is a property-right violation—a traditional harm. As the parties agree, property-right violations have been understood to per se inflict concrete harm. Section 1202 violations, by contrast, do not inherently infringe any property right.

Plaintiffs do not contend that removing CMI actually infringes any property right. Nor could they. Abundant textual, structural, and historical evidence demonstrates that copyright owners lack an intellectual-property right in CMI integrity. The Copyright Act identifies copyright owners' exclusive rights but does not include CMI integrity in that bundle. In enacting section

16

1202's prohibition on removing CMI, Congress did not use the language it typically does when identifying intellectual-property rights. Indeed, Congress did not identify CMI integrity as a "right" at all. Congress' remedial scheme confirms that CMI removal, unlike copyright infringement, does not itself inflict concrete injury. Unlike with intellectual-property rights, Congress did not authorize suits for CMI removal without any showing of injury. Congress required the plaintiff to establish that she was "injured by [the] violation." 17 U.S.C. § 1203(a). In other words, Congress did not view CMI removal as inherently injurious. Thus, unlike copyright infringement, which prohibits the actual infringement of a property right, section 1202 prophylactically regulates conduct—CMI removal—that may risk future copyright infringement. As in *TransUnion*, violating that prophylactic regulation does not inflict the same injury that actual copyright infringement does.

Plaintiffs offer a series of theories seeking to make section 1202 seem like a law prohibiting copyright infringement. Plaintiffs (at 23-28), for instance, claim it is sufficient that alleged CMI removal "interfere[s] with copyright-protected property" and emphasize that both section 1202 and copyright-infringement provisions seek to incentivize creation. But the question is not whether section 1202 is related to copyright law or serves similar purposes.

17

The question is instead whether the *harm* plaintiffs have suffered is akin to the *harm* copyright infringement inflicts. While copyright infringement inflicts a concrete injury because property-right violations are inherently injurious, plaintiffs identify no tradition of *non-infringing* "interferences" with copyrighted works giving rise to a per se Article III injury. And as *TransUnion* illustrates, just because two laws serve the same purpose does not mean that every violation of those laws inflicts a similar injury.

Plaintiffs ultimately retreat to arguing that the alleged CMI removal *risks* actual copyright infringement and alleging that OpenAI did engage in copyright infringement in the process of removing the CMI. Standing basics bar both of those arguments. The mere *risk* of a concrete injury is not itself a concrete injury. And injuries must be traceable to—*i.e.*, caused by—the alleged legal violation to provide standing for a given claim. Yet plaintiffs allege that OpenAI copied their work *and then* removed the CMI. As a result, any copying-based injury is not traceable to the later-occurring section 1202 violation and cannot provide the concrete injury plaintiffs require. While a section 1202 violation may give rise to a federal suit when the violation actually causes a concrete injury, plaintiffs' allegations here fall short.

18

B.  Plaintiffs' appeal to unjust enrichment fares no better.  Historically, unjust-enrichment cases involved a defendant receiving a benefit at the expense of the plaintiff.  But plaintiffs' theory here—that OpenAI allegedly saved money on computing costs by omitting CMI from the training sets—contains no alleged reciprocal loss or expense to plaintiffs.  As the district court correctly held, the lack of loss to plaintiffs forecloses their attempt to use unjust enrichment as an analogue for this DMCA claim.

Plaintiffs' unjust-enrichment analogue suffers from other deficits.  For one, it is inconsistent with multiple Supreme Court cases.  For another, plaintiffs' complaint contains only conclusory and superficial allegations supporting an unjust-enrichment-type claim.  So even were the Court inclined to find that unjust enrichment is an analogue for a DMCA claim in some circumstances, plaintiffs here have not carried their burden to show standing under that theory.

Plaintiffs' reliance on modern-day sources is telling.  Plaintiffs cite the DMCA's disgorgement mechanism, a Restatement from 2011, and two of this Court's modern cases considering other statutory schemes and analogues.  But none of these arguments demonstrates the requisite "close relationship" between plaintiffs' DMCA claim here and "historical," "traditionally

19

recognized" unjust-enrichment claims. *See TransUnion*, 594 U.S. at 424 (citation omitted).

II. Finally, the district court did not abuse its ample discretion in denying plaintiffs jurisdictional discovery. Plaintiffs' requested discovery into ChatGPT's outputs would be unduly burdensome and highly unlikely to produce any relevant information. Plaintiffs that have suffered a concrete injury usually know it without resort to such fishing expeditions.

## ARGUMENT

## I. Plaintiffs Lack Article III Standing

### A. Article III Demands A Concrete Injury

Article III empowers federal courts to resolve suits only where the plaintiff has "show[n] (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 423. "As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *Id.* at 430-31.

"No concrete harm, no standing." *Id.* at 417. To figure out whether an alleged injury is concrete, courts "assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (citation omitted). The

20

"inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* Some "harms readily qualify as concrete," including "traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Intangible harms "with a close relationship to harms traditionally recognized as providing a basis" for suit can count too, such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.*

Bare statutory violations do not themselves inflict concrete harm. Plaintiffs "cannot rely on technical violations of" law, "but must allege actual injuries suffered as a result of the alleged" violations. *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305 (2d Cir. 2024) (citation omitted). Because a statutory violation alone will not suffice, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), Congress cannot "simply enact an injury into existence," *TransUnion*, 594 U.S. at 426 (citation omitted). Thus, a plaintiff's "statutory cause of action to sue" and a plaintiff's constitutionally required "concrete harm" are distinct inquiries. *Id.* at 426-27. The "type of harm that a statute protects against is of little (or no) import" to the Article III analysis; what matters is the "alleged injury *to the plaintiff*" and its link to a historical analogue. *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 n.2 (2d Cir. 2021) (citation

omitted). At the motion-to-dismiss stage, courts accept "as true all material allegations of the complaint," *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540 (2d Cir. 2024) (citation omitted), and assess whether plaintiffs have pleaded "enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief," *Maddox*, 19 F.4th at 65-66 (citation omitted).

*TransUnion* illustrates how those principles play out. There, a class of plaintiffs sued TransUnion, a credit reporting agency, seeking statutory and punitive damages for alleged violations of the Fair Credit Reporting Act. 594 U.S. at 421. Plaintiffs alleged that TransUnion violated the Act's requirement to "follow reasonable procedures to assure maximum possible accuracy" by creating credit reports with incorrect information identifying the class members as potential "terrorists, drug traffickers, or serious criminals." *Id.* at 418-20 (citation omitted). As to some in the class, TransUnion sent out their credit reports with the false information to third-party businesses. *Id.* at 417. As to others, the false internal credit files remained in house and were never distributed. *Id.* All class members sought statutory damages for the violations. *Id.* at 421-22. The question for the Court was whether the creation and (for some) the dissemination of the false reports inflicted a concrete injury.

22

The Court held that merely violating the Fair Credit Reporting Act by preparing a false report does not itself inflict any concrete injury, meaning that only those whose false reports were actually distributed to third parties had standing to sue. *Id.* at 432-34. The distribution of this sort of false information bore "a close relationship to a harm traditionally recognized as providing a basis for" suit—"reputational harm." *Id.* at 432 (citation omitted). Those who did not have their reports disseminated were "a different story." *Id.* at 433. Despite having the same underlying legal violation, this group of plaintiffs did not suffer any injury akin to reputational harm. *Id.* And because there was "no historical or common-law analog where the mere existence of inaccurate information" amounted to concrete injury, this group of plaintiffs lacked standing. *Id.* at 434 (citation omitted).

## B.  Plaintiffs Have Not Alleged A Concrete Injury

J.K. Rowling suffers a concrete injury if a fan copies her book without authorization. But she suffers no further injury just because the fan, before reading the book, later removes the cover to make the book lighter to carry around. Separating an online news article's title, copyright notice, or author's name from the text of the article likewise does not itself inflict a concrete

23

injury.  Plaintiffs' analogies to copyright infringement and unjust enrichment fail to undermine that common-sense conclusion.

### 1.  Plaintiffs' Copyright-Infringement Analogy Fails

### a.  Copyright Infringement Is An Inapt Analogue

*TransUnion* sets the framework for evaluating plaintiffs' copyright-infringement analogue.  Plaintiffs must establish that the "harm" they have suffered has a "close relationship" to a harm that courts historically treated as an Article III injury.  *Id.* at 424.  Thus, the question is not whether section 1202 has some relationship to copyright law or copyright law's purposes.  The question is whether a section 1202 violation inflicts the same type of *harm* that has historically justified copyright-infringement suits upon a mere showing of infringement: the violation of a property right.

Because removing CMI does not itself infringe a property right, plaintiffs' copyright-infringement analogue fails.  In *TransUnion*, "reputational harm" could not provide an analogue for the harm inflicted by TransUnion's creation of a false credit report because the creation of a report does not actually inflict any reputational harm absent dissemination.  *Id.* at 432-34  So too here, copyright infringement's property-right injury cannot provide an analogue for the alleged harm caused by separating an article's text from the

24

article's title, author, and copyright notice, because removing that information does not infringe any property right unless it actually causes a copyright infringement.

1. It is common ground that copyright owners could always sue for copyright infringement without showing any injury beyond the infringement itself. But that is because the "individual harm forming the basis of Founding Era copyright suits was grounded in notions of property rights." *Intercept Media, Inc. v. OpenAI, Inc.*, 767 F. Supp. 3d 18, 27 (S.D.N.Y. 2025) (citations omitted). Historically, copyright protection "derived from the principle" that the work was "the author's property." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 349 (1998). And "[a]ctions seeking damages for infringement of common-law copyright" were treated "like actions seeking damages for invasions of other property rights" and "tried in courts of law." *See id.* As Blackstone explained, infringing an author's right in "his own original literary compositions" was conceived of as "an invasion of his right of property." 2 William Blackstone, *Commentaries* 405-06. Plaintiffs agree, explaining that a "copyright plaintiff's harm [is] one to 'a property interest in the copyrighted material,'" which explains why copyright infringement, like other

property-right infringements, constitutes a traditional "*per se* harm." Appellants Br. 27 (quoting *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010)).

Conversely, removing CMI does not infringe any property right, so removing CMI does not inflict a harm akin to copyright infringement. CMI integrity is neither a copyright owner's property right nor any other intellectual-property right. Section 1202 is instead a standard regulatory provision that prohibits certain conduct—CMI removal. And as *TransUnion* made clear, mere regulatory violations do not inflict Article III injury.

2. Removing CMI does not infringe any intellectual-property right. While plaintiffs do not appear to contend otherwise, the district court in *Intercept Media* did, suggesting that CMI integrity is "another stick [in] the bundle of property rights already guaranteed to an author in her work." *Intercept Media*, 767 F. Supp. 3d at 27. That is incorrect.

a. Section 1202 itself acknowledges that it is not creating any *right* to CMI integrity. Section 1202(b) is triggered only if the remover has knowledge or "reasonable grounds to know" that the removal will enable "*an infringement of any right* under this title." 17 U.S.C. § 1202(b) (emphasis added). Thus, Congress did not understand itself to be creating an intellectual-property right to CMI integrity that removal would infringe; Congress instead

26

prophylactically regulated conduct—CMI removal—that could lead to an actual infringement of intellectual-property rights. Merely removing CMI infringes no intellectual-property right unless it actually causes copyright infringement.

b. Moreover, CMI integrity is not one of the enumerated sticks of ownership provided to copyright owners. *Contra Intercept Media*, 767 F. Supp. 3d at 27. Congress vested "the owner of [a] copyright" with enumerated "exclusive rights," including the rights to reproduce the work, to distribute copies of the work, to perform the work, and to prepare derivative works. 17 U.S.C. § 106. Congress further provided that anyone who violates one of the listed "exclusive rights of the copyright owner," "is an infringer of the copyright." *Id.* § 501(a). CMI integrity is not one of those carefully enumerated rights held by a copyright owner. *See id.* § 106. So removing CMI does not infringe the copyright holder's intellectual-property right.

c. Nor can section 1202 be read as creating some new intellectual-property right in CMI on the theory that it is "one in a long line of rights Congress has added over the centuries." *Contra* Appellants Br. 29. Congress is clear when it vests an intellectual-property right: Congress textually identifies the intellectual-property right as a "right" held by an "owner." *See* 17 U.S.C.

27

§ 106.  Section 1202 by contrast, simply prohibits certain conduct; it does not grant anyone any "right."

Several examples illustrate the point:  When "Congress want[s] to" identify or create an intellectual-property right, "it sa[ys] so explicitly," *see Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 255 (2024), by identifying the intellectual-property rights as "rights" held by "owners."  The Copyright Act, for instance, gives an "owner" of a copyright certain "exclusive rights."  17 U.S.C. § 106.  Similarly, the trademark statutes call trademark holders the "owner of a right."  15 U.S.C. § 1114(2).[2]  And the patent laws likewise label the intellectual-property right a "right" held by the "patentee," 35 U.S.C. § 154(a), and identify patent rights as "the patent owner's rights," *id.* § 273(d).

The same goes for newer, less traditional intellectual-property rights.  Take for example the limited intellectual-property right to attribution and integrity Congress created in the Visual Artists Rights Act.  *See* 17 U.S.C.

---

[2] *See also id.* § 1115(a) (expressing the "registrant's exclusive right to use the registered mark in commerce" in connection with certain goods or services); *id.* § 1117(a) ("violation of any right of the registrant of a mark"); *id.* § 1125(d)(1)(B)(i)(I) (calling trademark an "intellectual property right[]"); *id.* § 1125(d)(2)(A)(i) ("right[s] of the owner of a mark").

28

§ 106A. Instead of simply prohibiting misattribution or false claims of authorship, Congress created a "right" to attribution and integrity that is held by an "owner[]"—the "author" of the work. *Id.* For instance, section 106A(a) provides that the "author of a work of visual art … shall have the *right* … to claim authorship of that work" and to "prevent the use of his or her name as the author of any work of visual art which he or she did not create." *Id.* (emphasis added). And section 106A(e)(2) refers to "[o]wnership of the rights conferred by" section 106A(a). Likewise, when Congress created intellectual-property rights in semiconductor chips, Congress called them "rights" held by an "owner," giving the "owner of the" protected semiconductor image certain "exclusive rights." *Id.* § 903.

Section 1202(b), by contrast, simply regulates conduct, providing that "[n]o person shall" remove or alter CMI in violation of the statute. Section 1202 does not identify CMI integrity as a "right" held by the copyright owner that can be "infringed." Unsurprisingly, then, members of Congress viewed section 1202 as "establish[ing] a general prohibition against removing or altering CMI" in order to prevent "fraud and misinformation," not as vesting a property right. *See* H. Rep. No. 105-551 pt. 1, at 10-11, 21 (1998).

29

Contrast section 1202 with another provision Congress enacted alongside it in the DMCA, which did create an intellectual-property right. In section 502 of the DMCA, Congress created an intellectual-property right in boat-hull designs. In doing so, Congress secured to the "owner" certain "exclusive right[s]," and specified acts that constitute "infringement of th[ose] exclusive rights." 17 U.S.C. §§ 1308, 1309. Had Congress intended likewise to create an intellectual-property right in CMI integrity in the very same legislation, it presumably would have used similar language in section 1202. After all, "[w]here Congress includes particular language" (here, "exclusive rights" and "infringement") "in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *See City & County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) (citation omitted).

d. Plaintiffs attack a strawman in arguing that they are not required to demonstrate that every "element" of a section 1202 violation is an "exact duplicate" of the elements of copyright infringement. *See* Appellants Br. 28-29 (citation omitted). Plaintiffs' copyright analogy fails not because section 1202 has different elements than copyright infringement. Rather, section 1202

30

violations do not inherently inflict a *harm* analogous to copyright infringement because section 1202 violations do not infringe any intellectual-property right.

Nor does OpenAI contend that "Congress could never create a cause of action that did not exist historically." *Contra* Appellants Br. 29. To the contrary. Violations of even new intellectual property rights—like the attribution, semiconductor-chip, and boat-hull rights discussed above—would inflict a concrete injury akin to copyright infringement.

e. Section 1202(b)'s proviso that the "copyright owner or the law" can grant others "authority" to remove or alter CMI does not suggest that CMI integrity is a property right vested in the copyright owner. When Congress prohibits certain acts to protect an individual's interests, Congress (naturally) often permits those acts if the individual consents. Doing so does not vest the individual with a property right.

For instance, Congress may prescribe a venue for a hearing, "unless the party afforded the hearing consents to another place." 12 U.S.C. § 2266(a). That does not mean the party has a property right in the default venue. The statutory scheme at issue in *TransUnion* prohibited consumer-reporting agencies from distributing a consumer report in certain circumstances without the "consent[]" or "authorization" of the consumer. 15 U.S.C. § 1681b. That

31

does not mean that consumers have a property right in their credit report. And while 28 U.S.C. § 295 prohibits the "designation and assignment of a circuit or district judge … without the consent of the chief judge or judicial council of the circuit," surely federal judges are not their chief judge's property.

f.  Plaintiffs (at 26) contend that section 1202's remedies are "identical" to the remedies for copyright infringement and "reflect[] an evident judgment" by Congress that section 1202 violations inflict the same injury as copyright infringement.  But section 1203's remedial scheme demonstrates the exact opposite.  Section 1203 does not automatically authorize suit upon a section 1202 violation.  Instead, section 1203 permits only "person[s] *injured* by a violation of section … 1202" to sue.  17 U.S.C. § 1203(a) (emphasis added).  Thus, Congress understood that section 1202 violations do not themselves inflict injury.

Section 1203's additional-injury requirement indeed illustrates that Congress understood that removing CMI does not inflict an injury akin to copyright infringement or any other intellectual-property right.  Since the Founding, Congress has permitted copyright-infringement suits based upon a mere showing of infringement—no additional injury beyond the inherent property-right injury needed.  *See* Copyright Act of 1790, ch. 15, § 2; 17 U.S.C.

§ 504(c)(1); Appellants Br. 24. The same is true with other intellectual-property rights, for which Congress authorizes suit upon the mere infringement of the property right. For instance, trademark violators "shall be liable in a civil action by the registrant." 15 U.S.C. § 1114(1). "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. For the right to attribution and integrity discussed above, the mere violation of the "exclusive rights … conferred by section 106A(a)" justifies suit. 17 U.S.C. § 501. And in the right to boat-hull designs enacted alongside section 1202 in the DMCA, Congress authorized suit upon "any infringement of the design." *Id.* § 1321(a). For section 1202 however, Congress stipulated that plaintiffs must show that they were "injured." *Id.* § 1203(a).

### b. Harm to Incentives Is Not Itself A Concrete Injury

Plaintiffs rely on the fact that prohibiting CMI removal and prohibiting copyright infringement "both protect against the same 'kind of harm'"—harm to the "incentives to create." Appellants Br. 23-26 (citation omitted). But the concrete injury that justifies copyright-infringement suits on a mere showing of infringement is *property-right* infringement, not the prospect of harmed incentives. Just because two laws seek to *prevent* the same harm does not mean

33

that every violation of one *inflicts* the same type of harm as a violation of the other.

1. Plaintiffs' harmed-incentives theory misunderstands the historical inquiry by focusing on the *purpose* of the laws rather than the *injuries* that violations of each law inflict. The inquiry is not whether the purpose of a modern law is analogous to the purpose of a historical law. Again, *TransUnion* requires a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit," not a relationship to a cause of action or its purposes. *TransUnion*, 594 U.S. at 424 (citation omitted).

In *TransUnion*, plaintiffs whose credit files contained misleading information in violation of the Fair Credit Reporting Act's requirement that reporting agencies take measures to "assure maximum possible accuracy" could not sue unless that information was disseminated. *Id.* at 431 (citation omitted). Of course, the Act's purpose was to prevent the dissemination of misleading information—a concrete injury—which is risked whenever a reporting agency creates a credit file with inaccurate information. But it was not enough that TransUnion had violated a law with the purpose of preventing the dissemination of reputation-harming information. Absent actual dissemination, the legal

34

violation did not inflict the same injury as any historical analogue. *Id.* at 433-35.

Likewise here. While section 1202 may share the purposes of copyright law (including to incentivize creation), violating section 1202 does not inflict the same *injury* that has long got copyright plaintiffs into court. Again, copyright infringement has historically sufficed without proof of economic injury because infringement violates a property right and is itself a concrete injury. *See supra* pp. 25-26. Violating section 1202 does not inflict that harm unless it actually causes copyright infringement.

Plaintiffs (at 24) intimate that "harmed incentives" were the reason why copyright infringement has historically per se justified suit. But they point to no law from the Founding, from today, or from anywhere in between that permitted copyright suits based purely on a theory of "harmed incentives" absent any property-rights violation. The nation's history of copyright suits therefore does not support plaintiffs' assertion (at 24) that "harmed incentives" are "without more … a concrete injury."

This should come as no surprise. There is a difference between the *reason* why a cause of action exists and the *concrete injury* an individual suffers from a given violation of that law. Indeed, not every copyright infringement

35

necessarily harms incentives. Take an example. If someone posts a verbatim copy of an author's novel online, she has committed actionable copyright infringement, even if that posting increases the book's popularity, boosting the sales of the author's other books and resulting in a movie deal. Why? Because every copyright infringement violates the owner's property rights, which itself inflicts a concrete harm regardless of whether the violation has actually increased the author's incentives to create.

2. In any event, plaintiffs' harmed-incentives injury is not sufficiently concrete, particularized, or traceable to establish Article III standing. On plaintiffs' telling, the injury works like this: Removing CMI "increase[s] [the] possibility of infringement," which "makes it more likely that Appellants (or some other publication) will no longer find it worthwhile to create new articles." Appellants Br. 25 (cleaned up) (quoting *Intercept Media*, 767 F. Supp. 3d at 28). This sort of speculative "injury" does not establish Article III standing.

For one, the specter of reduced creation is too speculative to be concrete. Suppose an individual decides not to create new works, fearing they will not be profitable because someone once removed CMI from her existing work without actually infringing her copyright. That supposed injury is far "too

36

speculative" to establish a concrete injury from a section 1202 violation. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Such "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm." *Id.* at 418 (citation omitted).

For another, the harmed-incentives injury is not sufficiently particularized to the copyright owner. As the case plaintiffs rely on for their harmed-incentives theory explains, this "'harm' is not always felt directly by" the plaintiff, but rather is a harm to the "public good." *Intercept Media*, 767 F. Supp. 3d at 28 (citation omitted). Thus, the harmed-incentives injury (to the extent it is an injury at all) does not "affect the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). Typically, efforts to "pursu[e] the public interest"—such as the public interest in producing more creative works—are left to the Executive Branch: Deputizing private plaintiffs to sue on behalf of society's interest in incentivizing creation "would infringe on the Executive Branch's Article II authority." *See TransUnion*, 594 U.S. at 429.

37

### c. Plaintiffs' "Interference With Copyright-Protected Property" Theory Does Not Establish Standing

Plaintiffs (at 27-28) argue that CMI removal "interfere[s] with copyright-protected property." But removing CMI does not itself "interfere" with any property right held by plaintiffs. And in any event, plaintiffs point to no tradition of suits based upon a mere non-infringing "interference" with copyrighted property.

1. Removing CMI does not "interfere" with plaintiffs' property. A copyright holder does not own a work. She owns only the copyrightable expression in the work, and even then, she possesses only certain exclusive rights in that copyrightable expression. *See, e.g.*, 17 U.S.C. §§ 102(b), 106, 202. Removing plaintiffs' CMI does not interfere with any of those rights.

In any event, plaintiffs identify no tradition of *non-infringing* "interferences" with copyrighted works giving rise to Article III injury. The relevant question under Article III is not whether the complained-of conduct in some way relates to a copyrighted work. The correct focus is on the *harm* inflicted—whether the harm plaintiffs have allegedly suffered is akin to a harm that has traditionally provided the basis for suit. *TransUnion*, 594 U.S. at 424. And

again, the basis for copyright-infringement suits has long been the actual violation of a property right.

Consider a variation of the earlier-mentioned Harry Potter hypothetical. If someone buys a Harry Potter book and later tears out pages he likes so that he can read them later, he has not inflicted any concrete injury on J.K. Rowling. That is because tearing pages from the book does not infringe her property right, regardless of the fact that Rowling owns a copyright covering the book. Nor would Rowling be injured were Congress to pass a law forbidding tearing pages out of books. Enacting a law and creating a cause of action do not "transform" what was previously not a concrete injury into a concrete injury. *Id.* at 426 (citation omitted). Causes of action simply provide a means for suing over what was *already* a "concrete, *de facto* injur[y]." *Id.* at 425 (citation omitted). The same is true here. Nobody contends that in the absence of section 1202, removing CMI alone would inflict any concrete harm. Section 1202's enactment did not change that status quo.

This is not to say that section 1202 violations never inflict concrete injury—just that a mere violation of section 1202 does not automatically do so. A plaintiff may suffer a concrete injury and be able to sue under section 1202 if the section 1202 violation *actually* leads to copyright infringement,

39

monetary harm, harm to the author's reputation, or any other concrete injury. And a plaintiff may sue for injunctive relief under section 1202 when there is an imminent threat that a section 1202 violation could lead to one of those concrete injuries. These plaintiffs, however, have pleaded nothing of the sort and on appeal have abandoned their request for injunctive relief.

2. Plaintiffs' citation (at 28) to *Saba Capital Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103 (2d Cir. 2023) does not help them. There, unlike here, an actual "property right" was infringed. *Id.* at 115-16 (citation omitted). *Saba* concerned a measure that eliminated the voting power of certain shares in an investment fund. *Id.* at 108-09, 114. This Court deemed the injury to inflict a "property-based" injury akin to the injury inflicted by conversion or trespass to chattels. *Id.* at 116. The reason: The voting power associated with stock ownership is one of the sticks in the ownership bundle, meaning that "[t]he voting strength attaching to shares of stock is as much a property right as any element of dominion possessed by an owner of realty." *Id.* at 115-16 (citation omitted). Here, however, CMI integrity is not one of the sticks in the copyright owner's bundle. *See supra* pp. 26-30.

40

### d. Risk of Copyright Infringement Is Not A Concrete Injury

Despite not bringing any copyright-infringement claim, plaintiffs (at 25) contend they have suffered an injury close enough to copyright infringement because (they claim) the removal of their CMI "increases the likelihood that a[] [copyright] infringement will occur." But an *increased risk* of a concrete injury is not itself a concrete injury in a damages suit.

"[I]n a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm." *TransUnion*, 594 U.S. at 436; *accord Guthrie*, 113 F.4th at 310-11. Again, take *TransUnion*. There, the reporting agency's unlawful creation of credit files with inaccurate information *risked* the dissemination of that information, and dissemination would have inflicted a concrete injury. *TransUnion*, 594 U.S. at 436-38. But, the Court held, plaintiffs could not sue for damages absent dissemination. *Risk* of dissemination was not enough. *Id.* Just as an unscathed driver does not suffer an Article III injury merely because he shares the road with a negligent driver who increases the likelihood of a collision, the Court explained, a disgruntled consumer is not injured when an unreleased false credit file increases the risk that inaccurate information about him may be made public. *Id.* at 436-37. So too here, plaintiffs cannot sue for damages by showing that CMI removal poses

41

some risk of copyright infringement.  In a damages suit like this one, only showing that CMI removal in fact caused some concrete, actual injury like a completed infringement will do.

### e.  Plaintiffs' Alleged Copyright-Infringement Injury Is Not Traceable To The Section 1202 Violation

Plaintiffs (at 30-32) also posit that even if the alleged legal violation—removal of CMI—does not inflict any Article III injury, OpenAI nonetheless injured plaintiffs by "remov[ing] Appellants' CMI by infringingly copying Appellants' articles."  In other words, even though plaintiffs did not plead a copyright-infringement claim, plaintiffs allege that they have suffered a concrete injury here because before allegedly removing plaintiffs' CMI, OpenAI allegedly engaged in copyright infringement by downloading plaintiffs' articles, which inflicts concrete injury.

The problem with this theory is traceability.  A plaintiff's "personal injury" must be "fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 668-69 (2021) (citation omitted).  Plaintiffs must, in other words, demonstrate that the unlawful conduct "has caused … the[ir] injury." *Id.* at 670.

Here, the alleged removal of plaintiffs' CMI did not *cause* the claimed copyright infringement; plaintiffs' allegation is instead that the copyright

42

infringement happened *before* the CMI removal. Plaintiffs cite two parts of their amended complaint in support of their allegation of copyright infringement. The first alleges that OpenAI "first" copied their articles in full, by "download[ing] and sav[ing] the relevant webpage," and then removed the CMI. J.A.109-110 (emphasis added). The second alleges what the claimed copyright infringement was, stating that "Defendants' actions in *downloading* thousands of Plaintiffs' articles without permission infringes Plaintiffs' copyright." J.A.113 (emphasis added). *A fortiori*, the CMI removal did not cause the earlier-occurring alleged copyright infringement.

And regardless of when any copying occurred, plaintiffs certainly have not pleaded facts that demonstrate the requisite causal connection. There is no evidence that OpenAI would not or could not have engaged in any copying (which OpenAI maintains did not constitute copyright infringement) had CMI been included. Again, plaintiffs' allegation is that OpenAI did copy their articles without removing plaintiffs' CMI. The presence of CMI was therefore apparently irrelevant to any alleged copying.

### f. The Constitution's Reference To Copyrights Does Not Establish A Concrete Injury Here

Plaintiffs also point out that copyright is "specified by the Constitution itself." Appellants Br. 23 (citation omitted). But that does not mean that CMI

43

removal is inherently injurious. The Constitution's Copyright Clause does not even make copyright infringement a per se concrete injury. While infringements to constitutional rights may be per se injurious, *see TransUnion*, 594 U.S. at 425, copyright is not a constitutional right; the Constitution simply gave Congress the *power* to create copyright laws, U.S. Const. art. I, § 8, cl. 8. The Constitution also gave Congress the power to regulate commerce, *id.* art. I, § 8, cl. 3, but not every violation of a law that regulates commerce inflicts an Article III injury, as in *TransUnion* itself. In the same way, copyright infringement itself is not per se injurious simply because copyright is mentioned in the Constitution. And in any event, CMI integrity is certainly not constitutionally enumerated.

### 2.     Plaintiffs' Unjust-Enrichment Analogy Fails

#### a.     Unjust Enrichment Is An Inapt Analogue

Plaintiffs (at 32-37) alternatively theorize that they have suffered a concrete injury because OpenAI unjustly enriched itself by allegedly removing CMI. Plaintiffs (at 33) claim that removing CMI saved OpenAI the expense of training ChatGPT not to emit CMI in response to user prompts when ordinary English speakers would omit it. Notably, and as the district court correctly recognized, plaintiffs do not identify any loss *they* suffered under this

theory. JA185. Rather, plaintiffs (at 33-34) contend that unjust-enrichment claims arise when defendants wrongfully gain something by violating plaintiffs' legally protected rights. But, for several reasons, unjust enrichment cannot support a concrete injury here.

1. Unjust-enrichment claims historically required defendants to have benefitted at plaintiffs' "expense." William A. Keener, A Treatise on the Law of Quasi-Contracts 16 (1893); *accord Pickens' Ex'rs v. Walker's Heirs*, 33 Ky. (3 Dana) 167, 169 (1835); *Booker's Adm'r v. Bell's Ex'rs*, 6 Ky. (3 Bibb) 173, 176 (1813); *Mickles v. Dillaye*, 17 N.Y. 80, 92 (1858); *Whitney v. Richardson*, 31 Vt. 300, 306-07 (1858); *Effinger v. Hall*, 81 Va. 94, 102 (1885); *see also Chapter One: The Intellectual History of Unjust Enrichment*, 133 Harv. L. Rev. 2077, 2084-89 (2020) (cataloguing early cases); J.B. Ames, *Purchase for Value Without Notice*, 1 Harv. L. Rev. 1, 3 (1887). Some courts framed unjust-enrichment claims expressly in terms of "loss," explaining that "one person will not be permitted, in equity, to enrich himself by the loss or at the expense of another." *Preston v. Brown*, 35 Ohio St. 18, 28 (1878); *accord Cadwallader v. Mason*, 1 Wythe 188, 189 (Va. Ch. 1793) (similar); *Griswold v. Bragg*, 48 F. 519, 521 (D. Conn. 1880) (enrichment "to the ruin[] of another").

Unjust-enrichment claims thus involved "not only a plus, but a minus quantity." Keener, *supra*, at 163; *accord* Frederic C. Woodward, The Law of Quasi Contracts 442 (1913). Courts asked whether "what has been added to the defendant's estate has been taken from the plaintiff's." *Rijeski v. Weiland*, 21 Pa. D. 313, 314 (Pa. Ct. Common Pleas 1910) (citation omitted). Early unjust-enrichment and quasi-contract cases often involved identifiable losses to the plaintiff. The pocketbook injuries included lost profits, *Cadwallader*, 1 Wythe at 189, costs associated with mistaken improvements made to land, *Bright v. Boyd*, 4 F. Cas. 134, 135 (C.C.D. Me. 1843), labor, *Britton v. Turner*, 6 N.H. 481, 486-87 (1834), mistaken payments, *Northrop's Ex'rs v. Graves*, 19 Conn. 548 (1849), or wrongfully withheld funds, *Hummel v. Hummel*, 14 N.E.2d 923 (Ohio 1938).

Courts' insistence on loss in unjust-enrichment cases followed from equitable first principles. "[U]njust enrichment is an equitable remedy." *Olson v. Major League Baseball*, 29 F.4th 59, 86 (2d Cir. 2022) (citation omitted). And plaintiffs seeking equitable relief had to show that they had suffered a "grievance"—*i.e.*, "specific factual circumstances involving loss or unfairness" resembling "injury in fact." Ernest A. Young, *Standing, Equity, and Injury in Fact*, 97 Notre Dame L. Rev. 1885, 1887-88 (2022). Without a grievance an

46

equity court would not involve itself. *Id.* Courts applied that general rule in unjust-enrichment cases, requiring a defendant's gain to have come at a plaintiff's expense. Keener, *supra*, at 164.

The First Restatement, issued in 1938, follows this approach. It recognizes that a "person [who] has been unjustly enriched at the *expense* of another is required to make restitution to the other." Restatement (First) of Restitution § 1 (1938) (emphasis added). "Ordinarily the benefit to the one and the loss to the other are co-extensive, and the result of the remedies … is to compel the one to surrender the benefit which he has received and thereby to make restitution to the other for the loss which he has suffered." *Id.* cmt. d. To be sure, the First Restatement acknowledged that there can be mismatches between plaintiffs' losses and defendants' benefits, and "in some cases" there might not be "any loss." *Id.* cmt. e. But the First Restatement cabins that dynamic to cases where the beneficiary is "under a duty" to the plaintiff, such as fiduciary relationships, *id.*, an exception that plainly does not apply here where OpenAI does not owe plaintiffs any special duty.

In accordance with historical practice and the First Restatement, some modern courts have likewise found that unjust enrichment requires a loss to the plaintiff, placing the district court here in good company. *E.g.*, *Bigio v.*

47

*Coca-Cola Co.*, 675 F.3d 163, 176-77 (2d Cir. 2012); *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 86-87 (2d Cir. 2021); *Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 36 (2d Cir. 2017); *S.F. Bay Area Rapid Transit Dist. v. Spencer*, 358 F. App'x 793, 795 (9th Cir. 2009); *del Veccio v. Amazon.com, Inc.*, 2012 WL 1997697, at *9 (W.D. Wash. June 1, 2012). The district court thus correctly concluded that the unjust-enrichment analogue failed because "[p]lainitffs do not explain how either the benefit or the expense of those costs would have found its way to or from [p]laintiffs' pockets." JA185.

2. The district court's unjust-enrichment holding also hewed to Supreme Court precedent. In *Thole v. U.S. Bank, N.A.*, the plaintiffs sued under ERISA, alleging their retirement plan was mismanaged. 590 U.S. 538 (2020). Under the plan, the plaintiffs received a fixed monthly payment, which remained the same before and after the alleged mismanagement. *Id.* at 540-41. Because the plaintiffs "would still receive the exact same monthly benefits" regardless of whether they won or lost their claim, the Court concluded they had "no concrete stake in the lawsuit" and "lack[ed] Article III standing." *Id.* at 541-42. In reaching that conclusion, the Court apparently rejected the theory that plaintiffs press here. Like plaintiffs, the *Thole* dissent cited the Third Restatement and insisted that "unjust enrichment" in violation of "legally

48

protected rights" inflicts a cognizable injury for standing purposes. *Id.* at 558 (Sotomayor, J., dissenting). But the majority disagreed, defeating the same argument here.

Similarly, in *TransUnion*, the Court implicitly rejected an unbounded unjust-enrichment theory. There, the dissent reasoned that "TransUnion violated consumers' rights" for "financial gain" and worried that the Court's decision put TransUnion "in a position to keep" those "ill-gotten gains." *TransUnion*, 594 U.S. at 459 (Thomas, J., dissenting). Once again, the majority appeared to reject that argument, insisting on concrete harm to the plaintiffs despite TransUnion's apparent windfall. *Id.* at 434-36.

The Court's repeated rejection of an unbounded unjust-enrichment theory preserves traditional standing limits. Regulated parties rarely violate statutes for no reason; they do so to gain an advantage. So if a statutory violation plus a benefit to the defendant were enough for Article III standing, almost *every* violation would suffice. The result? "[V]irtually any citizen [could] bring a statutory damages suit against virtually any defendant who violated virtually any federal law." *Id.* at 428. Yet that is precisely the outcome that *TransUnion* forbids. *Id.* at 428-29.

3. Finally, plaintiffs' unjust-enrichment analogue in any event fails because the proposed amended complaint includes only conclusory allegations supporting it. Just one paragraph of the proposed amended complaint speaks to plaintiffs' unjust-enrichment theory at all. Plaintiffs baldly assert that OpenAI "chose to remove the [CMI] at the outset, at least because doing so involves fewer computational resources and therefore is far less expensive than retraining" ChatGPT not to emit CMI in ordinary conversation. JA121. But plaintiffs provide no explanation as to (1) the degree of computational resources saved or (2) how that would actually translate to cost savings for OpenAI. That will not do for Article III purposes, even at the pleading stage. Plaintiffs "must plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief." *Guthrie*, 113 F.4th at 311 (citation omitted).

### b.    Plaintiffs' Counterarguments Lack Merit

Plaintiffs resist this conclusion with four erroneous counterarguments.

1. The DMCA's disgorgement mechanism for ill-gotten profits, 17 U.S.C. § 1203(c)(1) (cited at Appellants Br. 32), does not help plaintiffs for two reasons. For one, the existence of a statutory remedy does not matter under *TransUnion*—a plaintiff must show a real-world injury to satisfy Article III.

50

*Supra* pp. 22-23. For another, the DMCA does not authorize disgorgement in the absence of actual damages. Instead, courts may award wrongful profits alongside "actual damages" and only to the extent they are "not taken into account in computing the actual damages." 17 U.S.C. § 1203(c)(2). In that way, Congress linked the DMCA's disgorgement mechanism to damages and limited the right to seek relief under the Act to persons "*injured* by a violation of section 1201 or 1202." *Id.* § 1203(a) (emphasis added). Indeed, plaintiffs (at 26) elsewhere agree that the DMCA awards "actual damages plus profits." The statute thus offers no support for plaintiffs' theory that unjust enrichment, absent any loss to plaintiffs, will do for standing.

2. Plaintiffs (at 33) rely on the Third Restatement to argue that unjust-enrichment claims do not require loss to plaintiffs, because defendants can enrich themselves by violating plaintiffs' "legally protected rights." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (2011). But the Third Restatement acknowledges that the "paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other." *Id.* In any case, a secondary source from 2011 cannot satisfy *TransUnion*'s historical-analogue requirement, so

51

plaintiffs have failed to carry their "burden." *See TransUnion*, 594 U.S. at 424-25, 430.

When the task is evaluating historical practice, modern Restatements "must be used with caution." *See Kansas v. Nebraska*, 574 U.S. 445, 475 (2015) (Scalia, J., concurring in part and dissenting in part). In particular, "the Third Restatement of Restitution and Unjust Enrichment" included "novel extension[s]" rather than merely "present[ing] an orderly statement of the general common law." *Id.* at 475-76 (citations omitted). So the Third Restatement offers scant support for the notion that unjust enrichment traditionally required no proof of loss—a notion rejected by historical and common-law sources. *Supra* pp. 44-47.

3. Continuing their reliance on modern precedent, plaintiffs (at 34-35) cite *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Capital Management, LLC*, 105 F.4th 46 (2d Cir. 2024). But that case is inapposite. There, plaintiffs had standing to seek disgorgement of profits from beneficial owners who had transacted with company stock in violation of the Securities Exchange Act. *Id.* at 52-53, 56 (citing 15 U.S.C. § 78p(b)). As plaintiffs (at 35) concede, *Packer* relied on breach of fiduciary duty for its historical analogue, not unjust enrichment. Recognizing that gap, plaintiffs (at 35-36) conflate the two causes of

52

action. Though a breach of fiduciary duty could give rise to an unjust-enrichment remedy, *e.g.*, *Cantor v. Perelman*, 414 F.3d 430, 435 (3d Cir. 2005), not every unjust-enrichment claim is premised on a fiduciary relationship. The core of a breach-of-fiduciary-duty claim is a fiduciary relationship between the parties, which imposes special duties on the fiduciary "to act for the benefit of the other." Restatement (First) of Trusts § 2 cmt. b (1935). But no such relationship exists here or is contemplated by the DMCA.

*Moreira v. Société Générale, S.A.*, 125 F.4th 371 (2d Cir. 2025) (cited at Appellants Br. 36-37), is likewise inapposite. There, the Cuban government wrongfully confiscated plaintiffs' property and various banks trafficked the property. Using unjust enrichment as a historical analogue, this Court held that the plaintiffs had standing to sue the banks under the Helms-Burton Act's private right of action. *Id.* at 385-86. But as plaintiffs (at 36) concede, *Moreira* did *not* hold that plaintiffs had standing to sue without any loss. To the contrary, the Court referenced plaintiffs' lost profits, *id.* at 386—a far cry from the injury-less rule that plaintiffs seek here.

4. Finally, plaintiffs argue that even if unjust-enrichment claims did require loss to the plaintiff, *TransUnion* does not demand an exact duplicate. But *TransUnion* requires a "close relationship" between the alleged harms.

53

594 U.S. at 424 (citation omitted). In *TransUnion*, the Court found no such relationship between the alleged harm from a bare violation of the Fair Credit Reporting Act as to plaintiffs whose erroneous credit files were not disseminated and the harm from a common-law defamation claim. *Id.* at 434. The Court reasoned that dissemination is an essential component of defamation—without dissemination, there is no injury. *Id.* The Court further rejected plaintiffs' argument that the defendant had "published the class members' information internally" to employees and vendors. *Id.* at 434 n.6. The internal-publication theory did not "bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing," because "[m]any American courts did not traditionally recognize intra-company disclosures as actionable publications." *Id.* The same mode of analysis controls here. Plaintiffs' unjust-enrichment analogue fails because they cannot demonstrate that OpenAI's purported enrichment came at plaintiffs' expense, which is critical to forming the harm that underlies a historical unjust-enrichment claim.

## II.     There Is No Basis For Jurisdictional Discovery

This Court reviews "a district court's denial of jurisdictional discovery for abuse of discretion," keeping in mind "that a district court has wide latitude to determine the scope of discovery." *Arch Trading Corp. v. Republic of*

54

*Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) (citation omitted). Here, the district court correctly denied plaintiffs' request for speculative and burdensome jurisdictional discovery.

As the district court explained, plaintiffs' requested prolonging of jurisdictional discovery amounts to "looking for a needle in a haystack." JA186. The odds that plaintiffs' specific articles were disseminated by ChatGPT given the "quantity of information" that the LLM powering ChatGPT is trained on is, as the district court put it, "remote." JA211. It would be impractical, unduly burdensome, and beyond the scope of any normal form of jurisdictional discovery to order discovery into billions of ChatGPT responses[3] to see if plaintiffs' articles, from fringe news sources, were ever reproduced. The district court was well within its discretion—with its front-row seat to the litigation—to conclude that no further discovery was warranted.

At bottom, plaintiffs who have actually suffered a concrete harm typically know it. Jurisdictional discovery is not a tool for fishing expeditions by

---

[3] *See* Emma Roth, *OpenAI says ChatGPT users send over 2.5 billion prompts every day*, The Verge (July 21, 2025), https://tinyurl.com/377j9ky8.

those who observe legal violations and wish to figure out whether they were injured.[4]

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Lisa S. Blatt*

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
  *425 Market Street*
  *San Francisco, CA 94105*

ANDREW M. GASS
LATHAM & WATKINS LLP
  *505 Montgomery Street #2000*
  *San Francisco, CA 94111*

PAVEN MALHOTRA
KEKER, VAN NEST & PETERS LLP
  *633 Battery Street*
  *San Francisco, CA 94111*

LISA S. BLATT
  *Counsel of Record*
THOMAS G. HENTOFF
ERIN M. SIELAFF
ROHIT P. ASIRVATHAM
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Defendants-Appellees*

NOVEMBER 10, 2025

---

[4] OpenAI agrees with plaintiffs that "because the district court did not reach" the merits of OpenAI's failure-to-state-a-claim arguments, "this Court should not either." *See* Appellants Br. 42-43.

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing brief complies with the 14,000-word limitation of Local Rule 32.1(a)(4)(A), calculated by the word processing program Microsoft Word to contain 11,193 words, exclusive of the cover page, Table of Contents, Table of Authorities, signature blocks and Certifications, consistent with Federal Rule of Appellate Procedure 32(f), and uses a proportionally spaced, 14-point typeface. This further certifies that the PDF file submitted to the Court has been scanned for viruses using Microsoft Defender and is virus-free according to that program.

/s/ Lisa S. Blatt
LISA S. BLATT

NOVEMBER 10, 2025

57

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system.  I certify further that the foregoing brief was served on all parties or their counsel of record through the appellate CM/ECF system.

*/s/ Lisa S. Blatt*
LISA S. BLATT

NOVEMBER 10, 2025